**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re | Chapter 7 |
| PEREGRINE FINANCIAL GROUP, INC., | Case No. 12-27488 |
| Debtor. | Hon. Carol A. Doyle |
| | **Hearing date: December 4, 2019**<br>**Hearing time: 10:00 a.m.** |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that, on December 4, 2019, at 10:00 a.m., or as soon thereafter as counsel may be heard, we will appear before the Honorable Carol A. Doyle, or any judge sitting in her stead, in Courtroom 742 of the Everett McKinley Dirksen United States Courthouse, 219 S. Dearborn Street, Chicago, Illinois 60604, and present the **Trustee's Motion for Entry of an Order Authorizing the Sale and Assignment of the Estate's Right, Title and Interest in Forex Class Action Litigation Claim**, a copy of which is hereby served upon you.

IRA BODENSTEIN, Chapter 7 Trustee

Dated: November 13, 2019

By   /s/ Terence G. Banich
      One of his attorneys

Terence G. Banich (6269359)
Fox Rothschild LLP
321 N. Clark St., Ste. 1600
Chicago, Illinois 60654
(312) 980-3859
tbanich@foxrothschild.com

Active\104570881.v2-11/13/19

## CERTIFICATE OF SERVICE

Terence G. Banich certifies that he caused to be served a true copy of the **Trustee's Motion for Entry of an Order Authorizing the Sale and Assignment of the Estate's Right, Title and Interest in Forex Class Action Litigation Claim** upon the attached Electronic Mail Notice List through the ECF/CM System, U.S. Regular Mail and e-mail distribution, as indicated, on the 13th of November, 2019.

/s/ *Terence G. Banich*

**Mailing Information for Case 12-27488**

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- R Scott Alsterda    rsalsterda@nixonpeabody.com
- Gregory C Armstrong    gregory.armstrong@armstronglawgroup.com
- Terence G Banich    tbanich@foxrothschild.com, kjanecki@foxrothschild.com
- Stephen T. Bobo    sbobo@reedsmith.com, bankruptcy-2628@ecf.pacerpro.com
- Ira Bodenstein    ibodenstein@foxrothschild.com, plove@foxrothschild.com;chdocket@foxrothschild.com
- Ira Bodenstein    iratrustee@foxrothschild.com, IL29@ecfcbis.com;plove@foxrothschild.com;chdocket@foxrothschild.com
- Terrence Buehler    tbuehler@tbuehlerlaw.com, cbunker@tbuehlerlaw.com
- Patrick W Carothers    pcarothers@leechtishman.com, ghauswirth@leechtishman.com;bankruptcy@leechtishman.com;dtomko@leechtishman.com;challer@leechtishman.com
- Paul Catanese    pcatanese@mcguirewoods.com, docket@mcguirewoods.com
- David E Cohen    dcohen@fishercohen.com
- Brooke E Conner    bconner@vedderprice.com, ecfdocket@vedderprice.com;shampton@vedderprice.com;brooke-conner-0457@ecf.pacerpro.com;7610@ecf.pacerpro.com
- Brooke E Conner    bconner@vedderprice.com, ecfdocket@vedderprice.com;shampton@vedderprice.com;brooke-conner-0457@ecf.pacerpro.com;7610@ecf.pacerpro.com
- Jerome F Crotty    jcrotty@rieckcrotty.com, bhenry@rieckcrotty.com
- James M. Crowley    jcrowley@plunkettcooney.com, mfarhoud@plunkettcooney.com;mmusto@plunkettcooney.com
- Carrie E Davenport    cdavenport@shawfishman.com, kbobb@shawfishman.com
- Michael C Dell'Angelo    mdellangelo@bm.net, tstires@bm.net
- Jennifer Devroye    jdevroye@foxrothschild.com, kjanecki@foxrothschild.com
- David R Doyle    ddoyle@foxrothschild.com, kjanecki@foxrothschild.com
- Michael M. Eidelman    meidelman@vedderprice.com, ecfdocket@vedderprice.com;michael-eidelman-9405@ecf.pacerpro.com;7610@ecf.pacerpro.com

- Joseph O Enright    penright@ohfdlaw.com, dyucuis@ohfdlaw.com
- Robert M Fishman    rfishman@foxrothschild.com, kjanecki@foxrothschild.com
- Geoffrey S. Goodman    ggoodman@foley.com, egreen@foley.com;dnichols@foley.com
- Geoffrey S. Goodman    ggoodman@foley.com, egreen@foley.com;dnichols@foley.com
- Ava Gould    agould@cftc.gov
- Gordon E. Gouveia    ggouveia@foxrothschild.com, orafalovsky@foxrothschild.com
- Allen J Guon    aguon@foxrothschild.com, plove@foxrothschild.com;chdocket@foxrothschild.com
- John W Guzzardo    jguzzardo@hmblaw.com, ecfnotices@hmblaw.com
- Bernard A Henry    bhenry@rieckcrotty.com
- David Paul Holtkamp    dholtkamp@wfactorlaw.com
- Stephanie K. Hor-Chen    schen@vedderprice.com
- Allison Hudson    ahudson@vedderprice.com, ecfdocket@vedderprice.com
- Kevin M Hyde    khyde@shawfishman.com, kbobb@shawfishman.com
- Paula K. Jacobi    pjacobi@btlaw.com, jsantana@btlaw.com
- Cindy M. Johnson    cjohnson@jnlegal.net, KLindsey@jnlegal.net
- Andrew Jones    andrew@ajoneslaw.com
- Patrick M Kinnally    pkinnally@kfkllaw.com, mlenert@kfkllaw.com;tdegrado@kfkllaw.com
- Thomas S Kiriakos    tkiriakos@mayerbrown.com, Courtnotification@mayerbrown.com
- James C. Koutoulas    jk@typhoncap.com
- Patrick S Layng    USTPRegion11.ES.ECF@usdoj.gov
- Vincent E. Lazar    vlazar@jenner.com, docketing@jenner.com;thooker@jenner.com
- Vincent E. Lazar    vlazar@jenner.com, docketing@jenner.com;thooker@jenner.com
- Randall M Lending    rlending@vedderprice.com, trobinson@vedderprice.com;ecfdocket@vedderprice.com;7610@ecf.pacerpro.com;randall-lending-6329@ecf.pacerpro.com;toni-robinson-6174@ecf.pacerpro.com
- Susan Levy    susanjlevy@aol.com
- Kyle A Lindsey    klindsey@jnlegal.net, cjohnson@jnlegal.net
- James J McNamara    jmcnamara@srcattorneys.com
- Michael C. Moody    mmoody@orourkeandmoody.com, firm@orourkeandmoody.com,morourke@orourkeandmoody.com
- Michael C. Moody    mmoody@orourkeandmoody.com, firm@orourkeandmoody.com,morourke@orourkeandmoody.com
- David A. Newby    dnewby@momkus.com, lholub@momkus.com
- Michael J O'Rourke    morourke@orourkeandmoody.com, firm@orourkeandmoody.com
- Michael J O'Rourke    morourke@orourkeandmoody.com, firm@orourkeandmoody.com
- Francis J. Pendergast    fpendergast@crowleylamb.com, mfarhoud@crowleylamb.com;docket@crowleylamb.com
- James A Pope    jpope@popelegal.com, G33454@notify.cincompass.com
- Mark L Radtke    mradtke@foxrothschild.com, plove@foxrothschild.com;chdocket@foxrothschild.com
- Jack A Raisner    jar@outtengolden.com, jxh@outtengolden.com;kdeleon@outtengolden.com;kcarter@outtengolden.com

- Marc S Reiser    mreiser@shawfishman.com, mlites@shawfishman.com
- Robert E Richards    robert.richards@dentons.com, NDIL_ECF@dentons.com
- Peter J Roberts    proberts@foxrothschild.com, cknez@foxrothschild.com
- Steven Robinson    steven.robinson@sidley.com, steve.robinson@gmail.com
- Mark J Rose    mjroseesq@aol.com
- Rene S Roupinian    rsr@outtengolden.com, jxh@outtengolden.com;kdeleon@outtengolden.com;kcarter@outtengolden.com;jquinonez@outtengolden.com;bkouroupas@outtengolden.com
- Richard A. Saldinger    rsaldinger@llflegal.com
- Christina Sanfelippo    csanfelippo@foxrothschild.com, orafalovsky@foxrothschild.com
- Jessica M Scheller    jscheller@atg.state.il.us
- Vincent Paul Schmeltz III    vschmeltz@btlaw.com, jzipfel@btlaw.com;jlennon@btlaw.com
- Sean T Scott    stscott@mayerbrown.com, mlotito@mayerbrown.com
- Scott A Semenek    scott.semenek@faegrebd.com, droberg@faegrebd.com
- Brian L Shaw    bshaw@foxrothschild.com, cknez@foxrothschild.com
- Peter A Siddiqui    peter.siddiqui@katten.com
- Alan P. Solow    alan.solow@dlapiper.com, docketingchicago@dlapiper.com;oksana.koltko@dlapiper.com
- David Stein    ds@girardgibbs.com, 7316370420@filings.docketbird.com
- Gregory K Stern    greg@gregstern.com, steve_horvath@ilnb.uscourts.gov
- Anne W Stukes    astukes@cftc.gov, ogcecf@cftc.gov
- Jonathan D Sundheimer    jsundheimer@btlaw.com
- William W Thorsness    wthorsness@vedderprice.com, ecfdocket@vedderprice.com;ewatt@vedderprice.com;7610@ecf.pacerpro.com;william-thorsness-6297@ecf.pacerpro.com
- Rue K Toland    rtoland@mayerbrown.com
- John Edward Waters    IDRBankruptcy@Iowa.gov
- Stefanie Wowchuk McDonald    stefanie.mcdonald@dentons.com, NDIL_ECF@dentons.com
- Joseph R. Ziccardi    jziccardi@ziccardilaw.com
- Jonathan Zinman    jzinman@soluslp.com
- Bruce E de'Medici    bdemedici@gmail.com

4

**Parties Served Via U.S. Mail**

Chicago Clearing Corporation
Attn: Brian Blockovich
404 S. Wells St., Ste. 600
Chicago, IL 60607

**Parties Served Via E-Mail**

Rosemary Hollinger
Regional Counsel
CFTC
525 W, Monroe, Ste. 1100
Chicago, IL  60661
rhollinger@cftc.gov

Gilbert B. Weisman
Becket & Lee LLP
16 General Warren Blvd.
Malvern, PA  19355
Notices@becket-lee.com

Scott Williamson
Deputy Regional Counsel
525 W. Monroe St., Ste. 1100
Chicago, IL  60661
swilliamson@cftc.gov

Robert Wasserman
Chief Counsel
CFTC
1155 21st St. N.W.
Washington, D.C.  20581
rwasserman@cftc.gov

Roy Thompson
15938 SW Quarry Rd., Ste. B-6
Lake Oswego, OR  97035
roythompson@comcast.net

Outten & Golden LLP
Attn: Jack Raisner/Rene Roupinian
3 Park Ave., 29th Floor
New York, NY  10016
rsr@outtengolden.com
jar@outtengolden.com

Larry Lefoldt
Lefoldt & Co., P.A.
690 Towne Center Blvd.
Ridgeland, MS  39158
mllefoldt@lefoldt.com

Gretchen M. Silver
Office of US Trustee
219 S. Dearborn, Ste. 873
Chicago, IL  60604
Gretchen.silver@usdoj.gov

Joseph M. Russell
JP Morgan Chase Bank NA
10 S. Dearborn Street
Chicago, IL 60603
Joe.russell@jpmchase.com

5

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re | Chapter 7 |
| PEREGRINE FINANCIAL GROUP, INC., | Case No. 12-27488 |
| Debtor. | Hon. Carol A. Doyle |
| | **Hearing date: December 4, 2019** <br> **Hearing time: 10:00 a.m.** |

**TRUSTEE'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE SALE AND ASSIGNMENT OF THE ESTATE'S RIGHT, TITLE AND INTEREST IN FOREX CLASS ACTION LITIGATION CLAIM**

Ira Bodenstein, not individually, but solely in his capacity as chapter 7 trustee of the bankruptcy estate ("Estate") of Peregrine Financial Group, Inc. (the "Trustee"), hereby moves the Court (the "Motion"), pursuant to 11 U.S.C. § 363(b), (f) and (m), to authorize the sale of the Estate's right, title and interest in its claim filed in the class action styled *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, pending in the United States District Court for the Southern District of New York, as specifically described in that certain *Claims Assignment Agreement*, dated October 31, 2019 (**Exhibit 1**), to Certificate Funding Corporation.

**Jurisdiction and Venue**

1. On July 10, 2012, ("Petition Date"), Peregrine Financial Group, Inc. (the "Debtor") filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, thereby by commencing the above-captioned chapter 7 case (the "Case"). The Case is a commodity broker liquidation under subchapter IV of chapter 7. Ira Bodenstein is the duly appointed chapter 7 trustee of the Estate, and is authorized to operate the Debtor's business.

2. The Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. Venue is proper in this federal district under 28 U.S.C. § 1408. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

## Background

### A. The Debtor's Forex Business

3. Prior to the Petition Date, the Debtor was a futures commission merchant registered with the United States Commodity Futures Trading Commission that, in addition to its commodity futures business, entered into off-exchange foreign currency and spot metals transactions ("<u>Forex</u>") with certain of its customers (the "<u>Forex Business</u>").[1] The Debtor was engaged in the Forex Business for years prior to the Petition Date, and had thousands of Forex customers.

### B. The Forex Antitrust Class Action

4. On November 1, 2013, Haverhill Retirement System, on behalf of itself and all others similarly situated, commenced a civil action in the nature of a class action in the United States District Court for the Southern District of New York (the "<u>New York District Court</u>") against several financial institutions, styled *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 1:13-cv-07789-LGS (the "<u>Forex Antitrust Class Action</u>"). In the Forex Antitrust Class Action, the class plaintiffs allege that the defendant financial institutions conspired to fix prices in the Forex market in violation of sections 1 and 3 of the Antitrust Act, 15 U.S.C. §§ 1, 3, and manipulated the Forex market in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* Specifically, the class plaintiffs allege that defendants conspired to fix Forex benchmark rates paid by class members, which are prices that defendants published at certain times of the day at which they offered to, and did, enter into Forex transactions with members of the class.

5. The class plaintiffs assert that defendants manipulated the Forex benchmark rates to fix the "spreads" that defendants quoted to members of the class. Spreads are the difference

---

[1] A retail foreign currency transaction is a contract whereby an investor agrees to buy one national currency while, at the same time, agreeing to sell a different national currency. A spot metals transaction is a contract whereby a seller agrees to sell and deliver precious metals in exchange for cash to be delivered by the buyer either immediately or within two days.

between the rate at which a defendant financial institution indicated it would buy a currency pair and the rate at which a defendant financial institution would sell a currency pair. Class plaintiffs also assert that defendants' alleged conspiracy to fix Forex spreads reduced competition in the Forex market and artificially increased the spread, with the result that the defendant financial institutions bought currency pairs at a lower price than they would have absent the conspiracy, and quoted less competitive spreads than they would have absent the alleged collusion. Class plaintiffs conclude that, as a result of this alleged price-fixing conspiracy, class members were damaged by paying supra-competitive prices for Forex transactions. Class plaintiffs' preliminary damages model estimated that the range of damages the settlement classes could potentially obtain against all defendants was between $8 billion and $10 billion before trebling under the Antitrust Act.

    **C.**    **Settlement of the Forex Antitrust Class Action**

    6.    Following a mediation, most defendants agreed to settle and pay over $2.31 billion in cash for the benefit of the proposed settlement classes (the "<u>Settlement Fund</u>"). The Settlement Fund constitutes approximately 23% to 29% of the estimated damages referenced above. By orders entered on December 15, 2015, September 8, 2017 and September 29, 2017 (collectively, the "<u>Preliminary Approval Orders</u>"), the New York District Court preliminarily approved a settlement between the class plaintiffs and most of the defendants and a plan of distribution for the Settlement Fund, and directed that notice of the settlement and claims process be given to potential class members who were within one of the two settlement classes. (**Exhibits 2-4**.)

    7.    The Preliminary Approval Orders preliminarily approved two settlement classes, only one of which is relevant here. The "Direct Settlement Class" consists of:

> All Persons who, between January 1, 2003 and December 15, 2015, entered into an FX Instrument directly with a Defendant, a direct or indirect parent, subsidiary, or division of a Defendant, a Released Party, or co-conspirator where such Persons were either domiciled in the United States or its territories or, if domiciled outside the

3

United States or its territories, transacted FX Instruments in the United States or its territories.

8. A person or entity that is a member of one of the settlement classes and did not opt-out may be eligible to share in the "Net Settlement Fund," which essentially consists of the Settlement Fund less allowed attorney's fees and other expenses, but in no event less than $1,894,425,500.00 – i.e., 84% of the Settlement Fund. A claimant's eligible Forex transaction volume for the relevant time period essentially acted as a proxy to determine the claimant's relative pro rata share of the Net Settlement Fund, as described in greater detail below. As part of the Preliminary Approval Orders, the court appointed a claims administrator (the "Claims Administrator") to serve the approved "Notice of Class Action Settlements" on potential class members (the "Settlement Notice") (**Exhibit 5**.)

### D. Claims process in the Forex Antitrust Class Action

9. The Settlement Notice, among other things, explained the nature of the Forex Antitrust Class Action and invited potential class members to submit a claim form approved by the New York District Court (the "Claim Form") (**Exhibit 6**). The Claim Form presented two options for claiming an interest in the Net Settlement Fund. Under option 1, the Claims Administrator estimated the claimant's eligible Forex transaction volume using data submitted by the settling defendants. Under option 2, the Claims Administrator would estimate the claimant's eligible Forex transaction volume using data and documentation that the claimant submitted.

10. The Claims Administrator's estimation procedures worked essentially as follows. First, the Claims Administrator determined class members' eligible transaction volume in various Forex products. Then, the Claims Administrator used a model to estimate claim value to class members relative to one another, applying weightings to certain trade characteristics, such as currency pair and trade size, to generate the amount of each claimant's potential claim during the

4

relevant period ("Eligible Participation Amount" or "EPA"). Claimants had until May 16, 2018 to postmark their completed Claim Forms. Thereafter, the Claims Administrator would send out "Claim Assessment Notifications" stating each claimant's EPA and the basis for it.

### E. The Estate Claim

11. In approximately April 2018, the Trustee received the Settlement Notice from the Claims Administrator, and – with the assistance of Chicago Clearing Corporation, as discussed below – timely filed a Claim Form on behalf of the Estate seeking a payment from the Net Settlement Fund (the "Estate Claim"). The Claims Administrator assigned the Estate Claim claim no. 1349310 (**Exhibit 7**). The Trustee selected option 1 in submitting the Estate Claim, meaning that the Claims Administrator would determine the Estate's Eligible Participation Amount using documents and data submitted by the settling defendants.

12. On or about July 31, 2019, the Claims Administrator issued the Claim Assessment Notification in connection with the Estate Claim (the "Estate Claim Assessment") (**Exhibit 8**). The Estate Claim Assessment did not state the ultimate payment that the Estate would receive on account of the Estate Claim. Rather, it recited that the Claims Administrator had calculated the Estate's Eligible Transaction Volume ("ETV"), the Settlement Transaction Volume ("STV") and EPA. In essence, ETV, STV and EPA are metrics representing the claimant's trading volumes that are converted into eligible participation units per the court-approved plan of distribution.[2]

13. The Claims Administrator determined the Estate Claim as follows:

| ETV | 813,407,424,380 |
|---|---|
| STV | 479,389,923,229 |
| EPA | $937,137,065,661 |

---

[2] "Eligible Transaction Volume" referred to the notional amount of all eligible trades, while "Settlement Transaction Volume" referred to the notional amount of trades multiplied by certain conversion ratios. Finally, "Eligible Participation Amount," as discussed above, is the output of the Claims Administrator's model applying the weighting factors approved by the New York District Court.

5

14. Based on those figures, the Claims Administrator estimated that the Estate's payment on account of the Estate Claim would be over $1 million, but the exact payment amount would not be known until all claims have been filed and processed. The Estate Claim Assessment did not estimate when that date might be. (**Exhibit 8** at 2.)

    **F.    Evaluation of the Estate Claim and calculation of the Estimated Payment**

15. At or around the time that the Trustee received the Settlement Notice and Claim Form in April 2018, representatives of Chicago Clearing Corporation ("CCC") contacted the Trustee and offered to assist in the preparation of the Estate Claim and, potentially, buy it. CCC is a class action claim recovery service that files claims for investors in class action settlement funds. When CCC buys filed claims in class action settlements, it calculates a recognized loss before distribution occurs and purchases the claim for a percentage of the estimated recovery.

16. On or about May 2, 2018, the Trustee engaged CCC to prepare and file the Estate Claim on behalf of the Trustee and the Estate, which CCC did on a timely basis. CCC then developed an estimated payment model for all claims filed in the Forex Antitrust Class Action (the "CCC Payment Model"). On or about July 31, 2019, the Claims Administrator issued the Estate Claim Assessment, as discussed above, along with the Debtor's Forex trading data underlying that assessment. CCC reviewed the Forex trading data supplied by the Claims Administrator, and inputted it into the CCC Payment Model. CCC did this not only to give the Trustee another reference point with which to evaluate the Claims Administrator's conclusions about the Estate Claim, but also to help CCC decide whether it wanted to purchase the Estate Claim.

17. Applying the CCC Payment Model to the available trading data, CCC determined that the Estate would likely recover **$1,712,465.33** on account of the Estate Claim (the "Estimated Claim Payment"). The Estimated Claim Payment is basically CCC's calculation of what the Estate's pro rata distribution from the Net Settlement Fund (which for this purpose CCC has

6

estimated will be $1,950,000,000) is likely to be. CCC's methodology to determine the Estimated Claim Payment is extremely complex and based on an incomprehensively massive amount of trading data. Nonetheless, the Trustee now attempts to summarize the basics of CCC's calculation.

18. To calculate the Estimated Claim Payment (i.e., the Estate's pro rata share of the $1.95 billion Net Settlement Fund), CCC first had to estimate the sum total of all EPA for *all* potential claims. This is effectively the denominator of the following equation:

$$Net\ Settlement\ Fund \left( \frac{Claimant's\ EPA}{Estimated\ Total\ EPA} \right) = Estimated\ Payment$$

The Debtor's EPA – which, as discussed above, was determined by the Claims Administrator from Forex trading data supplied by the settling defendants – was $937,137,065,661.00. CCC estimates that the total EPA for all filed claims will be $3.952 *quadrillion*. Thus, using these numbers, the Estimated Claim Payment equation is expressed as follows:

$$\$1,950,000,000 \left( \frac{\$937,137,065,661.00}{\$3,952,320,691,431,420.00} \right) = Estimated\ Payment$$

19. However, the $3.952 quadrillion number reflects the estimated total EPA for all *potential* claims. In other words, that number assumes that 100% of all potential claimants timely file allowed claims. That obviously will not happen. Instead, the CCC Payment Model applies a discount multiplier to the estimated total EPA denominator to index that figure against the likely percentage of filed allowed claims, a metric CCC calls the "Participation Rate." Using empirical claim data from other class action settlements, CCC estimates that the Participation Rate for the Forex Antitrust Class Action will range from 15% on the low end to a maximum of 46.24% on the high end. Thus, the EPA denominator in the Estimated Claim Payment equation, indexed against the low, mid and high Participation Rates, varies as follows:

| Participation Rate | Estimated Total EPA | Indexed EPA |
|---|---|---|
| 46.24% (high) | $3,952,320,691,431,420.00 | $1,827,417,278,038,950.00 |

7

| Participation Rate | Estimated Total EPA | Indexed EPA |
|---|---|---|
| 30.62% (mid) | $3,952,320,691,431,420.00 | $1,210,200,595,716,301.00 |
| 15.00% (low) | $3,952,320,691,431,420.00 | $592,712,294,035,773.00 |

Obviously, like any equation involving division, the larger the denominator gets against a constant numerator, the smaller the quotient will be. Applied here, a higher Participation Rate results in a larger EPA denominator, and thus a smaller quotient – i.e., a smaller estimated pro rata share of the Net Settlement Fund. Conversely, a low Participation Rate yields a higher pro rata share of the Net Settlement Fund because, put colloquially, there are not as many slices of the "pie."

20. Calculating the Estate's pro rata share of the Net Settlement Proceeds using the high, mid and low indexed EPAs in the table in the previous paragraph can be expressed in the following equations:

**Low (15% Participation Rate):**

$$\$1,950,000,000 \left( \frac{\$937,137,065,661.00}{\$592,712,294,035,773.00} \right) = \$3,083,143.47$$

**Mid (30.62% Participation Rate):**

$$\$1,950,000,000 \left( \frac{\$937,137,065,661.00}{\$1,210,200,595,716,301.00} \right) = \$1,510,011.88$$

**High (46.24% Participation Rate):**

$$\$1,950,000,000 \left( \frac{\$937,137,065,661.00}{\$1,827,417,278,038,950.00} \right) = \$1,000,000.00$$

Thus, the estimated payment the Estate might receive on account of the Estate Claim would likely range from $1 million on the low end and $3 million on the high end, depending almost entirely on what the Participation Rate turns out to be. As noted above, however, CCC estimates that the Participation Rate for the Forex Antitrust Class Action will actually be around 27%, which, applying the equation in the previous paragraph, yields an estimated payment on account of the Estate Claim of $1,712,465.33 (i.e., the "Estimated Payment" defined above).

8

### G. The proposed sale and assignment of the Estate Claim

21. Based on its analysis, CCC indicated interest in acquiring the Estate Claim. CCC made available to the Trustee and his professionals all of the underlying data, assumptions, methodology and analysis that formed the basis of CCC's evaluation of the Estate Claim that led to the calculation of the Estimated Claim Payment. CCC also carefully explained its work product so that the Trustee and his professionals had an adequate understanding of it. After negotiations, the Trustee agreed (the "Transaction") to sell and assign, and CCC agreed that its affiliate, Certificate Funding Corporation ("CFC"), would purchase and accept, the Estate Claim in exchange for a cash payment of $1,594,553.21 (the "Purchase Price").

22. The terms of the Transaction are recited in the *Claims Assignment Agreement*, dated October 31, 2019, and the exhibits thereto, between the Trustee and CFC (collectively, the "Agreement") (**Exhibit 1**). The principal terms of the Agreement are:

   (a) The Trustee's obligation to perform thereunder is contingent on this Court approving the Agreement and its terms by entry of an order pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "Approval Order").

   (b) The Trustee sells and assigns all to CFC all of the Estate's right, title and interest in and to the Estate Claim in exchange for a cash payment in the amount of the Purchase Price, contingent upon entry of the Approval Order.

   (c) The Trustee warrants to CFC that, among other things, to the best of his knowledge acquired solely in his capacity as representative of the Estate and as custodian of the Debtor's books and records, he has furnished to CCC and CFC accurate and complete information about the Estate Claim.

   (d) CFC warrants to the Trustee that it is engaged in the business of purchasing class action claims to recover funds from class action lawsuit settlements and therefore is a sophisticated purchaser of assets similar to the Estate Claim, and understands the risk of loss associated therewith.

   (e) The Trustee confers on CFC the authority to take all actions as holder of the Estate Claim, such as opting out of the settlement, and delivers to CFC a notice of assignment for exhibition to third parties.

**Legal Standards**

23.     Section 363(b)(1) of the Bankruptcy Code permits the trustee to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. 11 U.S.C. § 363(b)(1).[3] A sale is permissible and will be authorized as long as the trustee has an "articulated business justification." *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991). The trustee's justification warrants judicial approval if the sale "makes good business sense" – that is, "creditors as a whole should benefit" – and the transaction "preserves the priorities among the creditors." *In re UAL Corp.*, 443 F.3d 565, 571-72 (7th Cir. 2006). Additionally, a trustee should "provide[] adequate notice to all creditors" of the sale motion. *Schipper*, 933 F.2d at 515.

24.     A bankruptcy court reviews a trustee's business judgment "to determine independently whether the judgment is a reasonable one," yet it "should not substitute its judgment for the trustee's." *In re Efoora, Inc.*, 472 B.R. 481, 488 (Bankr. N.D. Ill. 2012) (quoting 3 COLLIER ON BANKRUPTCY ¶ 363.02[4] at 363-18 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012)). "A trustee has considerable discretion when it comes to the sale of estate assets, and that discretion is entitled to 'great judicial deference' as long as a sound business reason is given." *Id.* (quoting *In re State Park Bldg. Grp., Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005)).[4]

**Argument**

**I.     The Court should approve the Transaction under § 363(b).**

25.     Based upon the benchmarks discussed above, the Court should approve and authorize the Trustee to consummate the proposed Transaction. The business justification for the Transaction is self-evident. The Estate Claim is a most unusual Estate asset. Unlike many assets

---

[3] "The settlement of a cause of action held by the estate is plainly the equivalent of a sale of that claim" under § 363(b). *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 n.7 (Bankr. N.D. Ill. 1994).

[4] A sale of estate property outside the ordinary course of business may be completed "by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1).

10

that could be sold and assigned outside the ordinary course, the Estate Claim is effectively found money – "all profit to the recipient." *Michael Carpenter Co. v. Comm'r of Internal Revenue*, 136 F.2d 51, 53 (7th Cir. 1943). It exists only as a result of how the Debtor's Forex Business was evidently impacted by the alleged anticompetitive and abusive tactics of the financial institutions who are defendants in the Forex Antitrust Class Action.

26. But that asset presently has an uncertain value. It is unknown when the Claims Administrator will complete the claims-review and reconciliation process, and thus begin to make payments to holders of allowed claims. Selling and assigning the Estate Claim to CFC now, albeit for a discount from the Estimated Claim Payment amount, will allow the Trustee monetize that asset on an immediate basis for the benefit of the Estate. The alternative is to await the completion of the claims process in the Forex Antitrust Class Action, which may well require this Case to remain open for an indeterminate time (possibly years) simply to await receipt of that payment. While waiting out the claims process may have made sense if this Case were in its early stages, it will likely be closed in 2020. It is the Trustee's business judgment that reducing the Estate Claim to cash now will expedite the closure of this Case. Furthermore, monetizing the Estate Claim now eliminates any risk that it will end up being actually worth less than the Purchase Price. CFC assumes that risk, but in exchange, will enjoy any up-side on the ultimate payout.

27. The Trustee, therefore, diligently investigated the Estate Claim to assure himself that the Purchase Price was fair and reasonable. *See, e.g., Efoora*, 472 B.R. at 492 (a bankruptcy trustee must conduct an adequate investigation prior to selling estate assets). CCC gave the Trustee and his professionals complete access to all of its work product underlying its analysis of the Estate Claim, and the bases for its view of what the Participation Rate was likely to be. The Trustee delved into those materials and met with CCC personnel to attain an understanding of the claim

11

itself, and CCC's independent evaluation of it. Having done that investigation, the Trustee is confident that the Purchase Price is fair consideration for the Estate Claim.

28. CCC predicts that the actual cash value of the Estate Claim will range from $3,083,143.47 to $1,000,000. The midpoint between those two estimated cash values is $1,510,011.88. (*Supra* ¶ 20.) The Trustee, however, was able to negotiate a Purchase Price of $1,594,553.21 – a figure that is higher than the midpoint, and not too much lower than the Estimated Payment, i.e., the $1,712,465.33 that CCC believes the Estate Claim is likely actually worth. Consequently, the Trustee has not agreed to sell the Estate Claim at too drastic a discount from the Estimated Payment. For these reasons, the Trustee respectfully submits that the Transaction "makes good business sense" because "creditors as a whole should benefit" from it. *UAL Corp.*, 443 F.3d at 571-72. The Court should therefore authorize the Trustee to sell the Estate Claim to CCC free and clear of interests therein, if any.

## II.    CFC and CCC are entitled to a good-faith finding under § 363(m).

29. The Court should also find that CFC is buying the Estate Claim in good faith for purposes of § 363(m). "[I]f a bankruptcy court authorizes the sale of property … to an entity that purchased … such property in good faith," the sale is "final." *In re River W. Plaza-Chicago, LLC*, 664 F.3d 668, 671 (7th Cir. 2011). CFC (and its affiliate, CCC), the purchaser, are not related to, and have no connection with, the Debtor or the Trustee. The proposed Transaction is not the result of any fraud, collusion or other bad acts by CFC or CCC that were intended to take unfair advantage of other potential purchasers. The Agreement is the form agreement that CFC uses for similar class-action claim acquisitions, though it freely allowed the Trustee to propose edits to it. As such, it is plainly an arms-length transaction. Consequently, the Trustee respectfully submits that CCC and CFC qualify for the protections afforded by § 363(m).

**Related Relief**

30. The Trustee has given notice of the Motion to CFC/CCC and the parties on the "master service list" established by the order of August 7, 2002 [Docket #38]. The Trustee submits that no further or other notice is required, and requests that the Court waive the 14-day stay under Rule 6004(h).

**WHEREFORE**, the Trustee moves the Court to enter an order: (a) granting the Motion; (b) approving the Transaction, authorizing the Trustee to sell, assign and convey the Estate Claim to CFC in exchange for the Purchase Price free and clear of any interests therein, and authorizing the Trustee to execute and deliver the Claims Assignment Agreement (and the other documents annexed thereto); (d) finding that CFC and CCC have acted in good faith for purposes of § 363(m); (e) waiving the 14-day stay of Rule 6004(h); (f) limiting the notice of the Motion to that given; and (g) granting such further relief as the Court deems necessary and appropriate.

Dated: November 13, 2019

Respectfully submitted,

IRA BODENSTEIN, not personally, but as chapter 7 trustee for the estate of Peregrine Financial Group, Inc. d/b/a PFG Best

By: /s/Terence G. Banich
    One of his attorneys

Terence G. Banich (#6269359)
Fox Rothschild LLP
321 N. Clark St., Ste. 1600
Chicago, Illinois 60654
(312) 980-3859
tbanich@foxrothschild.com

13